Filed 4/16/13 P. v. Castro CA1/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>MANUEL JOE CASTRO,<br><br>        Defendant and Appellant. | A131098<br><br>(Alameda County<br>Super. Ct. No. CH48461) |

A jury found defendant Manuel Joe Castro guilty of three counts of committing lewd acts upon a child, and found true the allegation that the counts involved multiple victims. The trial court sentenced him to serve three concurrent terms of 15 years to life in prison, pursuant to Penal Code section 667.61.[1] On appeal, he claims the trial court erred in allowing the admission of evidence of a police interview that he asserts was taken in violation of his *Miranda*[2] rights. We affirm.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Defendant was arrested on February 3, 2009.

On March 8, 2010, an information was filed accusing defendant of three counts of having committed lewd acts upon a child under the age of 14 (§ 288, subd. (a)). The information includes allegations that the offenses involved the same victim on separate occasions (§ 667.6, subds. (c), (d)), and involved multiple victims (§ 667.61, subd. (c), § 667.61, former subd. (e)(5), now subd. (e)(4)).

---

[1] All further statutory references are to the Penal Code except as otherwise indicated.

[2] *Miranda v. Arizona* (1966) 384 U.S. 436.

Following a hearing held under Evidence Code section 402, the trial court denied defendant's objections to the admission of evidence of a videotaped confession.

## A. The Prosecution's Case

### 1. The Amber Doe Incidents

During the school year, between 60 and 70 children attend an after-school program at an elementary school. While in the program, children are required to ask a staff member for permission before going to the restroom. Children who are in the fourth through sixth grades are allowed to walk to the restrooms by themselves.

Katrina Armstrong testified that she received a telephone call from another parent of a child in the program, asking her if the janitor at the school was giving the children candy. When she asked her children about it, they told her the janitor was giving candy to a girl named Amber. Armstrong immediately called Amber's mother to let her know.

Amber's mother testified that her daughter was in the fourth grade during the 2008–2009 school year, and was enrolled in the after-school program. In January 2009, she received the call from Armstrong telling her the janitor was reportedly giving Amber candy. Amber had previously brought candy home, and had disclosed that it was given to her by the janitor. At that time, Amber's mother told her that she should stop taking candy from the janitor and she should stay away from him. Amber agreed. When she received Armstrong's call, which was about a week and a half later, she had another conversation with her daughter and asked why she was getting the candy. Amber told her that the janitor had given it to her because he was touching her. Amber's mother called her husband who told her to call the police.

Amber was 11 years old at the time of trial. She testified that she had attended the after-school program with her older brother. The first time defendant approached her, he introduced himself and asked her what her name was. He gave her a Nestle's Crunch candy bar. He gave her candy 10 to 20 times after that, mostly during her fourth grade year. When she left the classroom that housed the after-school program to use the bathroom, he would see her in the hallway and call her over to give her candy. She was always alone during these times.

2

On two occasions, Amber entered a classroom with defendant. The first such incident occurred before the Christmas holiday in 2008. In the classroom, defendant asked her to sit on his lap. He sat on a chair in the middle of the classroom and she sat on his lap, with her back to his chest. He put his hand on his lap before she sat down, and when she sat down his hand was on her butt cheeks. His other hand was on her chest near her neck, pushing her back. His pants did not come off and he did not put his hands inside her pants. He asked her if she wanted to pull her pants down. She told him "no." After that she got up and left the classroom. He went out to the hallway with her and gave her candy. He always had three kinds of candy on his cart and would let her pick the one that she wanted. On this occasion, she picked a Butterfinger. She went back to the after-school program and told two of her friends that defendant had touched her and given her a candy bar. She did not tell any adults because she thought she might get in trouble for taking the candy.

The second incident occurred after Christmas 2008. She went with defendant into a classroom that had a library area with a red couch. He took her arm and walked her over to the couch. He bent her forwards over the arm of the couch, so that her head was on the seat cushion. He undid the button and zipper on her pants and put his hand inside her underwear and touched her butt cheeks. His body was behind her. Later, he moved his hand around to the front of her pants and placed it on her privates. She testified that she did not see what his other hand was doing. After five or ten minutes he asked her if she wanted to pull her pants down and she said "no." She also told him that she needed to leave. He said, "just a little more." He did whatever he was doing for a little while longer. Afterwards, she buttoned her pants and he pulled his pants back up. As he did so, she saw his underwear was dark blue with gray around the top. He gave her candy again and she left.

## 2. The A. Doe Incidents

In February 2009, T.M. read an article about a janitor at the school who had behaved inappropriately. She recognized the suspect as the paternal grandfather of her

granddaughter, A.. A few days later, T.M. called her daughter, A.'s mother, and read the article to her.

T.M. testified that her daughter did not communicate well with the child's father, who is defendant's son. When A. was about six years old, a court order for visitation was set in place. The child would visit her father at defendant's house, which is where her father was living at that time.

A.'s mother testified that defendant's son was not very involved in their daughter's life when she was young. In 2000, when A. was seven years old, he went to court and obtained the visitation order. The order gave him visitation every other weekend. However, he only came about half the time to pick her up for these visits. When her mother told her about the newspaper article regarding defendant, she became worried because A. had spent a lot of time at defendant's house. She asked her daughter about her experience with defendant. A. disclosed that defendant had touched her "from behind." About a week later, they decided to go to the police.

On cross-examination, A.'s mother testified she had previously harbored concerns about visitation because the child did not know her father well and did not appear to feel comfortable leaving the house with him. When A. was 10 year old, she began complaining that she did not want to spend the night away from home during her visits. At that time, she did not mention having had any inappropriate contact with defendant.

A. was 17 years old at the time of trial. She testified that she does not have any memories of her father before the time when she was seven or eight years old. When she was eight she started seeing him on a regular basis. She would stay overnight at her paternal grandparents' house during her visits. She would sleep in her father's room. Her father sometimes slept in the same room with her, but about half the time he would be at his girlfriend's house.

When A. was eight or nine, she and defendant were watching a movie on the television in his bedroom. They were lying on the bed together when he "put his penis in [her] butt." He lifted up her skirt, pulled her underwear down, and penetrated her anus with his penis. He told her not to tell her mother.

4

On another occasion, defendant came into A.'s father's room at night when she was sleeping on her father's bed. Defendant got under the covers and pulled down her underwear and her pajamas. He put his penis in between her butt cheeks and rubbed his penis against her butt. He also engaged in sexual behavior two other times when she was in the living room of the house. The first time, she was watching television at night. He sat next to her and tried to put his hand up her skirt. She got up and went to the bathroom. At the time, she was in the third or fourth grade. Another time when she was sleeping on a couch in the living room, he came into the room with his penis exposed. He did not touch her, and then he went away. She was about 11 or 12 years old at that time.

### 3. Dan Anderson

Detective Dan Anderson testified he was assigned to investigate this case on February 2, 2009. On that day, he took Amber Doe to the Child Abuse Listening Interviewing and Coordination Center (CALICO), which is a center for children who are victims of abuse or neglect, or who have witnessed major crimes. There, children are examined and interviewed by trained professionals. The following day, he obtained a search warrant for defendant's home, as well as an arrest warrant. The search uncovered two Butterfinger candy bars in the top drawer of a nightstand in the master bedroom, and a pair of blue thermal underwear. Defendant was arrested. After the arrest, the police department generated a news release. Subsequently, A. Doe came forward and Anderson met with her at the CALICO Center.

Anderson interviewed defendant on the day of his arrest. A video recording of the interview was played to the jurors, who were given transcripts to assist them.

### 4. Susan Borows

Susan Borows testified as an expert witness on Child Sexual Abuse Accommodation Syndrome. She explained that children tend to keep abuse secret if they are told by the abuser that they should not tell anyone. Children also are helpless by nature, in that they depend on adults to keep them safe. Therefore, they are not inclined to go to others for help. Abused children feel trapped in their situations, and will adjust

5

to, or accommodate, their abuse because they believe nothing can be done to stop it. Seventy-five to 80 percent of these children will never disclose what happened. Alternatively, their disclosure may be delayed, minimized, or accompanied by self-doubt. Sometimes a child who discloses abuse will later recant. In Borows's opinion, it is unlikely that children who make delayed disclosures are lying about their prior abuse.

## B. Defendant's Case

Veronica, defendant's adult daughter, testified that she lives with her parents. In the past, A. would come over every other weekend to visit and would spend Saturday nights at the house. She would sleep in defendant's son's room, and either the son or the grandmother would sleep on the other bed in that room. Some times she slept in Veronica's room. She did not sleep by herself. Someone was always home when the girl was at the house. The girl never told Veronica that defendant had done anything inappropriate to her. On cross-examination, Veronica stated that she believed A. was lying about the abuse and that her mother had put the idea into her head.

## C. The Verdict and Sentence

The jury found defendant guilty on all three counts and found true the multiple victim allegation. The trial court sentenced him to a term of 15 years to life. This appeal followed.

## DISCUSSION

Defendant claims the trial court committed prejudicial error in admitting evidence of his interview with Anderson. He contends that Anderson: (1) impermissibly diluted the *Miranda* admonishment, (2) failed to cease the interrogation after defendant invoked his right to counsel, and (3) improperly induced him to make an incriminating statement.

## I. The Interview

Defendant was arrested on February 3, 2009 at the school district's corporation yard. He was handcuffed, placed in Anderson's vehicle, and driven to the police department. At the pretrial evidentiary hearing, Anderson testified that he did not speak to defendant while they were in the police car. Later, defendant was placed in a room by himself while Anderson served a search warrant on his house. Anderson executed the

6

warrant and returned to the station less than an hour later. He met with defendant in an interview room at 6:26 p.m. and activated the video recorder.[3]

Anderson began by explaining the charges, and advised defendant that bail had been set at $120,000. He also told him that during the search of his house, the police had recovered two candy bars and a pair of blue thermal underwear with a gray waistband. He then advised defendant of his *Miranda* rights by reviewing a police department form: "Number one, I wanna advise you that you do have the right to remain silent. You don't have to talk, unless you want to. Um, anything that you say can and will be used against you in a court of law." Anderson then added: "Obviously, uh, the reason that we obtain a statement from people is so that they can tell their side of the story and their version of things." Anderson also advised defendant of his right to appointed counsel, and asked if he understood each of these rights. Defendant responded affirmatively and wrote "yes" on the form to so indicate. Anderson continued, "And then the second question is that knowing that you have these rights, do you wanna provide a statement in this case?" Defendant said, "I'd like a public defender to help me." Anderson said, "Okay. That's fine. Then go ahead and write your 'no' answer on that."

Immediately after this exchange, Anderson said defendant's daughter had mentioned that he has high blood pressure. He asked defendant if he took any medication. When defendant responded affirmatively, Anderson told him he would have to be booked at the Santa Rita jail, not the Fremont jail, because the Fremont jail is not equipped to handle medical problems.[4] He explained defendant would stay in jail until he got a court date, unless he could post bail. Defendant asked about the bail amount, and Anderson told him he could go through a bondsman but that he would not be released on his own recognizance at this time. Defendant responded, "Okay." Then Anderson

---

[3] The record on appeal includes a DVD with the video recording of the interview, which we have reviewed.

[4] The Fremont jail is seven miles from the Newark Police Department. Santa Rita is about 23 miles away.

stated, "Uh but that's up to a judge to decide.  That's some – somewhere different in the proceeding here.  So let's see – Two 3, '09 and we are 6:31 here."

At that point, defendant asked, "Can you tell me how my wife is taking it?"  Anderson replied, "Um, she was a little bit shaken up."  He described how his daughter had been helpful in explaining the situation to his wife.  Defendant then asked: "Do you know how much jail time this is?"  Anderson replied, "Um, that's, you know – that's something – you have a conversation with your attorney at this point.  I mean it's – there's – there's certainly the potential – you're charged with two felony crimes so there is that potential but that's something that you'll need to talk to your attorney about and – and come up with something that you both think you can – can – can live with so – all right?"  Anderson began placing his paperwork into a portfolio, apparently preparing to leave the room.

Defendant asked if he could go to the Fremont jail, and, as he zipped the portfolio closed, Anderson explained again that he would have to go to Santa Rita because the Fremont jail is not equipped to address medical issues.  Defendant stated that he had his medications at home.  Anderson replied that he would need to undergo a medical evaluation before he would be permitted to receive medications while in custody.

At this point, defendant raised his hand as if to interrupt Anderson, whereupon he stated, "What a stupid thing to have done, you know.  I don't know what was in my mind when, you know – what – what went through something like that.  Usually that's not me or anything like that.  I just – now I have to pay the consequences."  Anderson responded, "Okay."  Defendant continued, "Might have to pay everything now with, uh . . . ."  Anderson stated, "Okay.  Do you want to talk about this?  I mean, you just – you just told me basically that you want to talk to an attorney.  But if you wanna talk about it, it's up to you."  Defendant stated: "Well, I feel the way I feel right now – it's just like – I mean, you can't take it back or anything like that. . . .  But it was just a bad judge on myself.  Did what I did, you know.  It's just, you know, silly – sorry for the fact there's too many people involved."

8

Anderson stated: "And I'm not trying to sway you either way. I just have to be mindful of the legalities of this and that I've already asked you if you wanna talk and you said 'no.' There may be some clarification here. If you – if you wanna clarify exactly what happened versus what might be being alleged against you that might be a helpful thing. But that's something that you have to decide yourself if you wanna do that 'cause now you – now that you've said that you don't wanna talk but then you've made these statements that there might be something. . . ." Defendant responded, "Yeah. I have nothing to hide – I have nothing to hide. And I'm gonna tell the same to my – my lawyer or anything like that but . . . ."

Defendant then asked Anderson to explain what effect his making a statement could have. Anderson replied: "In all reality I can't promise you what will or will not happen either way. What I can do is I can tell you this – generally when people cooperate the district attorney looks at that a little bit different than they do when somebody doesn't cooperate." He gave an analogy of a robber accused of using a gun in a bank, when his participation was actually limited to having been the driver of the getaway car. Anderson continued, "And so, again, I don't wanna put words in your mouth. I have – don't wanna force you to give a statement. But I'm just saying in – in – in your own interest if you feel that there's something there that you can clarify and be up front and honest about things in exactly what did happen, my thought is that will eventually help you at some point down the line."

Anderson further explained: "And – and again, I use that example of a bank robbery because, again, one of the things is when people do something wrong sometimes people admit responsibility and they move on, sometimes they deny it even in the face of overwhelming odds, you know. Oh my God we got you on video on a bank robbing – you know what I mean – robbing a bank. And they still say, no, no it wasn't me. So there's degrees of this and again you can't escape responsibility for the things that did happen but you can clarify what it was that did happen. So that you don't get accused of something far more serious than what really did happen. So that's – that's just kinda food for thought for you. And again, I can't – you know, I can't sway you one way or the

9

[other,] other than to say my thought is it – it would probably improve the way that they look at you down the line. Whether that has an impact or not is on – is up to the district attorney." At that point, defendant agreed to make a statement. His statement is fairly consistent with the testimony Amber Doe gave in court, which we have described above.

## II. *The Evidentiary Ruling*

At the pretrial hearing, Anderson admitted that his objective during interrogations is to gain a confession. He also confirmed that suspects are not free to get up and go to the bathroom or use the telephone without an officer's approval. He believed he could continue to speak with defendant after he had invoked his right to an attorney because the inquiry regarding his high blood pressure was not relevant to the investigation. Rather, it was a question pertaining to defendant's booking status. Anderson explained that detectives do not generally transport suspects from the police station to jail because their vehicles are not equipped to do that. Instead, suspects are handed off to patrol officers. The detectives tell the officers whether a suspect is to be transported to Fremont or Santa Rita. The detectives also advise the officers of any medical condition so that they can pass along the information to jail staff.

At some point, defendant asked Anderson how much jail time he could be facing. Anderson told him there was certainly a potential for jail time as he had been charged with two felonies. He said this "just to manage his expectations," so that he would understand that he was not going to be released immediately. He also told defendant that the district attorney would look at him differently if he cooperated versus if he did not cooperate. By saying cooperation might be helpful, he was trying to imply that it possibly could benefit defendant in some way, though he could only speculate. Defendant then spoke of matters relating to the case, and Anderson asked him again to clarify if he wanted to provide a statement. Anderson stated he is trained to end interrogations if the suspect asks for an attorney. However, he believed it is permissible to ask booking questions, and to ask questions to clarify whether a suspect actually wants to provide a statement.

10

The trial court concluded defendant had been "clearly and appropriately" advised of his rights, and initially had invoked them by stating that he wanted a public defender to help him and by writing "no" on the form as to whether he wanted to provide a statement. Anderson clearly understood that this was an invocation, as he stopped all interrogation at that point. The issue was thus whether defendant had reinitiated the discussion leading to his confession. The court found the comments made by Anderson after the invocation were appropriate and "in no way coercive," as he was simply giving defendant "an idea of what was coming and what he could expect." Defendant turned this "very clear situation" into an ambiguous one by voluntarily interjecting himself and creating a question mark as to whether he wanted to talk. The conversation leading up to his final decision to talk to the detective was not threatening or coercive, nor did it include promises of leniency. Accordingly, the court concluded there were sufficient grounds for finding the statement was made voluntarily: "The defendant's rights were scrupulously honored and his statement would be admissible."

### III. Relevant Authority

"In determining whether a confession was voluntary, '[t]he question is whether defendant's choice to confess was not "essentially free" because his will was overborne.' [Citation.]" (*People v. Massie* (1998) 19 Cal.4th 550, 576 (*Massie*).) The courts must consider the totality of circumstances in determining whether a statement was voluntary. (*People v. Williams* (1997) 16 Cal.4th 635, 661.) In addition to any police coercion, the totality of the circumstances includes such factors as the length of the interrogation, its location, and the defendant's maturity, education, physical condition, and mental health. (*Massie, supra,* at p. 576.)

A confession may be involuntary even if *Miranda* warnings have been given. (*Dickerson v. United States* (2000) 530 U.S. 428, 444; *Miller v. Fenton* (1985) 474 U.S. 104, 110.) However, " '[c]ases in which a defendant can make a colorable argument that a self-incriminating statement was "compelled" despite the fact that the law enforcement authorities adhered to the dictates of *Miranda* are rare.' [Citation.]" (*Dickerson, supra,* at p. 444.)

11

We review the trial court's findings as to the circumstances surrounding the confession under the substantial evidence test, but we independently review the trial court's finding as to the voluntariness of the confession. (*People v. Carrington* (2009) 47 Cal.4th 145, 169.)

## IV. *Contentions on Appeal*

### A. **Miranda** *Advisement*

Defendant first claims he was not properly advised of his rights prior to the commencement of his custodial interrogation. Specifically, he claims that when Anderson read him his rights, he improperly interjected the following statement: "Obviously, uh, the reason that we obtain a statement from people is so that they can tell their side of the story and their version of things." Defendant claims this comment implies that a suspect may benefit in some way by telling his or her side of the story, since otherwise the police will only have the complaining witness's version of the events. He relies on *In re Joseph R.* (1998) 65 Cal.App.4th 954, 964, fn. 2 (*Joseph R.*), wherein it quotes *People v. Benson* (1990) 52 Cal.3d 754 (*Benson*).[5]

The relevant passage in *Benson* states: "A confession is 'obtained' by a promise within the proscription of both the federal and state due process guaranties if and only if inducement and statement are linked, as it were, by 'proximate' causation. This is certainly true for the federal right. The requisite causal connection between promise and confession must be more than 'but for': causation-in-fact is insufficient. [Citation.] 'If the test was whether a statement would have been made but for the law enforcement conduct, virtually no statement would be deemed voluntary because few people give incriminating statements in the absence of some kind of official action.' [Citation.] The foregoing is also true for the state right." (*Benson, supra,* 52 Cal.3d 754, 778–779.)

We analyze below the substantive issues pertaining to allegedly improper promises of leniency with respect to other statements made by Anderson during the

---

[5] We note the passage defendant cites to in *Joseph R.* is contained in a footnote in the dissenting opinion: " '[N]o opinion has value as a precedent on points as to which there is no agreement of a majority of the court. [Citations.]' [Citations.]" (*People v. Byrd* (2001) 89 Cal.App.4th 1373, 1383.)

12

course of the interview. Here, regardless of whether Anderson's interjection amounted to an inappropriate promise of leniency, there is no causal connection between the challenged statement and defendant's confession, as he invoked his right to remain silent immediately after Anderson completed the entire advisement. Thus, the insertion of the challenged statement within the recitation of the *Miranda* advisements cannot be linked to his subsequent confession. Further, the challenged statement itself contains no promises whatsoever. It merely describes the commonsense notion that people who choose to speak for themselves invariably "tell their side of the story."

We also note the United States Supreme Court "ha[s] never insisted that *Miranda* warnings be given in the exact form described in that decision. In *Miranda* itself, the Court said that '[t]he warnings required and the waiver necessary in accordance with our opinion today are, in the absence of a fully effective equivalent, prerequisites to the admissibility of any statement made by a defendant.' [Citation.] [Citation.] . . . '[T]he "rigidity" of *Miranda* [does not] extend to the precise formulation of the warnings given a criminal defendant,' and . . . 'no talismanic incantation [is] required to satisfy its strictures.' [Citation.]" (*Duckworth v. Eagan* (1989) 492 U.S. 195, 202–203, fn. & italics omitted, quoting *Miranda, supra,* 384 U.S. 436, 476 and *California v. Prysock* (1981) 453 U.S. 355, 359.) "The inquiry is simply whether the warnings reasonably 'convey to [a suspect] his rights as required by *Miranda*.' " (*Duckworth, supra,* at p. 203, quoting *Prysock, supra,* at p. 361.) Here, defendant does not dispute that he received the required warnings. The argument fails.

## B. Alleged Violation of Assertion of Right to Counsel

Defendant next contends his confession was obtained in violation of his assertion of his right to counsel under *Miranda*.

Our Supreme Court stated in *People v. Stitely* (2005) 35 Cal.4th 514, 535: "To protect the Fifth Amendment privilege against self-incrimination, a person undergoing a custodial interrogation must first be advised of his right to remain silent, to the presence of counsel, and to appointed counsel, if indigent. [Citation.] As long as the suspect knowingly and intelligently waives these rights, the police are free to interrogate him.

13

[Citation.] However, if, at any point in the interview, the suspect invokes his rights, questioning must cease. [Citations.] Statements obtained in violation of these rules are inadmissible to prove guilt in a criminal case." The United States Supreme Court has held that where a suspect asserts the right to counsel, questioning may not resume until an attorney is present, unless the arrestee voluntarily initiates contact with the authorities. (*Edwards v. Arizona* (1981) 451 U.S. 477, 484–485; *People v. Neal* (2003) 31 Cal.4th 63, 67; *People v. Storm* (2002) 28 Cal.4th 1007, 1021 (*Storm*); *People v. Bradford* (1997) 14 Cal.4th 1005, 1033–1034 (*Bradford*).) Volunteered statements of any kind are not barred by the Fifth Amendment and police officers may speak to a suspect in custody as long as their speech would not reasonably be construed as calling for an incriminatory response. (*People v. Gamache* (2010) 48 Cal.4th 347, 387–388.)

" 'An accused "initiates" ' further communication, exchanges, or conversations of the requisite nature 'when he speaks words or engages in conduct that can be "fairly said to represent a desire" on his part "to open up a more generalized discussion relating directly or indirectly to the investigation." ' [Citation.]" (*People v. San Nicolas* (2004) 34 Cal.4th 614, 642; accord, *People v. Waidla* (2000) 22 Cal.4th 690, 727.) " '[W]here reinterrogation follows, the burden remains upon the prosecution to show that subsequent events indicated a waiver of the Fifth Amendment right to have counsel present during the interrogation.' [Citation.]" (*People v. Sims* (1993) 5 Cal.4th 405, 440; accord, *People v. Bradford* (1997) 15 Cal.4th 1229, 1311.) Thus, the People must show both that the defendant reinitiated discussions and that he knowingly and intelligently waived the right he had invoked. (*People v. Davis* (2009) 46 Cal.4th 539, 596.) If instead the police reinitiate discussion without a break in custody, any further statements by the defendant are presumed involuntary and rendered inadmissible. (*McNeil v. Wisconsin* (1991) 501 U.S. 171, 177; *Storm, supra,* 28 Cal.4th 1007, 1021–1022.) The question whether it was the defendant or the police who reinitiated communications of the requisite nature, after the defendant's invocation of the right to counsel, is predominantly factual. (*People v. Mickey* (1991) 54 Cal.3d 612, 649 (*Mickey*).) Accordingly, we review it for substantial evidence. (*Waidla, supra,* at p. 731.)

14

Defendant contends Anderson did not cease questioning him because the detective's continued inquiries regarding his health, and his responses to defendant's inquiries regarding bail and transportation to jail, were not "booking questions," but were instead questions designed to coerce him into making an incriminating statement. He also claims he did not reinitiate the interview "simply by blurting out" the statement: "What a stupid thing to have done, you know? I don't know what was in my mind when, you know, what went through something like that."

We agree with the trial court that Anderson's post-invocation remarks did not rise to the level of an interrogation. "Interrogation ' "refers not only to express questioning, but also to any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect." ' [Citations.]" (*People v. Aguilera* (1996) 51 Cal.App.4th 1151, 1161; see also *People v. Mayfield* (1997) 14 Cal.4th 668, 732.) Interrogation occurs "whenever a person in custody is subjected to either express questioning or its functional equivalent." (*Rhode Island v. Innis* (1980) 446 U.S. 291, 300–301; see also *People v. Haley* (2004) 34 Cal.4th 283, 300 (*Haley*).) "Clearly, not all conversation between an officer and a suspect constitutes interrogation. The police may speak to a suspect in custody as long as the speech would not reasonably be construed as calling for an incriminating response." (*People v. Clark* (1993) 5 Cal.4th 950, 985 (*Clark*), disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

"This is an objective standard. 'The subjective intent of the [officer] is relevant but not conclusive . . . .' [Citations.]" (*People v. Wader* (1993) 5 Cal.4th 610, 637.) The definition of interrogation " 'focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. But, since the police surely cannot be held accountable for the unforeseeable results of their words or

15

actions, the definition of interrogation can extend only to words or actions on the part of police officers that they should have known were reasonably likely to elicit an incriminating response.' [Citation.]" (*Haley, supra,* 34 Cal.4th 283, 300, italics omitted.)

We agree with the trial court that Anderson respected defendant's invocation of his right to counsel. Following defendant's indication that he did not want to talk about the case, Anderson made no further substantive inquiries. He did not attempt to engage defendant in a conversation about the case itself. Instead, Anderson inquired as to defendant's health and explained the booking procedures, including where he would be incarcerated and why, and how he could arrange to be released on bail. Many of Anderson's statements on these points were prompted by defendant's own questions. The detective's remarks did not call for responses relating to the charged offenses, nor, we conclude, were they reasonably likely to elicit them. (*Bradford, supra,* 14 Cal.4th 1005, 1034–1035; *People v. Dominick* (1986) 182 Cal.App.3d 1174, 1192; *United States v. Moreno-Flores* (9th Cir. 1994) 33 F.3d 1164, 1169.) Nothing in the record indicates to us that defendant "was subject to 'compelling influences, psychological ploys, or direct questioning.' [Citation.]" (*Clark, supra,* 5 Cal.4th 950, 986.)

The record is undisputed that defendant, without prompting, admitted he had done "a stupid thing," and that he did not know what he was thinking at the time. This statement "can be 'fairly said to represent a desire' on his part 'to open up a more generalized discussion relating directly or indirectly to the investigation.' [Citation.]" (*Mickey, supra,* 54 Cal.3d 612, 648.) While he claims he did not reinitiate the interview, and that Anderson must have so understood because he asked defendant to clarify whether he really wanted to talk about the case, the record supports the opposite conclusion. Defendant had his rights explained to him; he recognized their value by immediately declaring that he wanted the assistance of a public defender. He expressly waived his right to counsel a mere seven minutes after having first invoked this right. Even after defendant blurted out that he had done a "stupid thing," Anderson took pains to remind him that he had asserted his right to counsel and had elected not to provide a

16

statement. We agree with the trial court that defendant's *Miranda* rights were not violated.

## C. *Defendant's Confession Was Not Involuntary*

Defendant next contends that his confession was involuntary because Anderson implicitly promised leniency if he confessed. An involuntary confession—one that is not free because the defendant's will was overborne—is inadmissible at trial under the due process guarantees of the United States and California Constitutions. (*Mincey v. Arizona* (1978) 437 U.S. 385, 398; *Massie, supra,* 19 Cal.4th 550, 576; see also *People v. Smith* (2007) 40 Cal.4th 483, 501.) A confession is involuntary when elicited by a promise of some benefit or leniency, whether express or implied, and the wrongful inducement and the defendant's statement are causally linked. (*People v. Holloway* (2004) 33 Cal.4th 96, 115; *People v. Maury* (2003) 30 Cal.4th 342, 404–405; see also *Colorado v. Connelly* (1986) 479 U.S. 157, 164, fn. 2.) But mere advice or exhortation by the police that it would be better for the accused to tell the truth, when unaccompanied by a promise of some benefit or leniency, does not render a subsequent confession involuntary. When the defendant, however, is given to understand that he or she might reasonably expect more lenient treatment at the hands of the police, prosecution, or the courts, in consideration of making a statement, even a truthful one, the inducement may render any ensuing statement by the defendant involuntary and, thus, inadmissible. (*Holloway, supra,* at p. 115.) Although detectives may not lead a suspect to believe he might get the benefit of more lenient treatment if a statement is made, detectives may point out the benefit that flows naturally from a truthful and honest course of conduct. (*People v. Jimenez* (1978) 21 Cal.3d 595, 611–612, overruled on other grounds in *People v. Cahill* (1993) 5 Cal.4th 478, 509–510, fn. 17; see also *People v. Hill* (1967) 66 Cal.2d 536, 549.) There can be a fine line between permissibly urging a suspect to tell the truth by outlining the benefits that may flow from confessing and impermissibly making an implied promise of lenient treatment in exchange for a confession. (*Holloway, supra,* at p. 117.)

Review of the video recording of the interview supports the trial court's finding that no coercion occurred. Anderson made every effort to make defendant feel

comfortable and at ease. He conversed with him in a friendly and matter-of-fact manner. The general mood of the entire interview was low-key, calm, and devoid of a coercive atmosphere. Anderson was discussing the topic of medications when defendant spontaneously raised his hand in a gesture indicating that he wanted to interrupt and initiate a new topic of conversation. The record thus establishes a knowing, voluntary, and intelligent waiver of his rights. "[V]olunteered statements not the product of interrogation are admissible." (*People v. Edwards* (1991) 54 Cal.3d 787, 815.) A police officer is not obligated to prevent a suspect from volunteering incriminating statements.

Defendant claims it is "clear" from the interview that he agreed to provide a statement as the "direct result" of "promises." Anderson's remarks as to how the district attorney might view the case if defendant did provide a statement were not false or misleading. Further, the detective qualified his remarks by repeatedly stating that he could not make any guarantees, and that the choice to make a statement was up to defendant. Defendant admits he asked Anderson to explain how making a statement could affect his case. Finally, in the video, defendant presents as an intelligent, mature individual who is concerned about the consequences that his behavior will have on his own family, as well as on the victim and her family. We find no error.

### D. The Error, if any, Was Harmless

Defendant claims the introduction of the confession was prejudicial because the only other evidence of the crimes was the uncorroborated testimony of the two complaining witnesses, one of which concerned "biased allegations in the remote past." He also complains he was prevented from disputing Amber Doe's testimony, noting that his confession to having molested her strongly corroborated A. Doe's testimony.

Assuming, for purposes of argument, we were to find defendant's statements were obtained in violation of his right to counsel, the admission of the evidence was harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24; *People v. Cunningham* (2001) 25 Cal.4th 926, 994.) The error is subject to harmless error analysis because it does not necessarily render a criminal trial fundamentally unfair or an

18

unreliable vehicle for determining guilt or innocence. (*People v. Magee* (2003) 107 Cal.App.4th 188, 194.)

As to the witnesses' testimony, it is settled that the direct evidence of even a single witness is sufficient to sustain a conviction unless the testimony is physically impossible or inherently improbable. (See, e.g., *People v. Watts* (1999) 76 Cal.App.4th 1250, 1259; see also Evid. Code, § 411.) There is nothing physically impossible or inherently improbable about either victim's testimony. Further, the testimony of the two girls corroborated each other when they testified about defendant's sexual attraction to young girls, as well as to the types of acts he would engage in. Physical evidence obtained by the search warrant supported Amber's testimony as to the candy bars and the underwear defendant wore during the second incident. Her mother also testified regarding the candy bars and that she had forbade her from taking any more candy from defendant. On this record, we agree with the People that any error in admitting defendant's statements to the police was harmless beyond a reasonable doubt. (*Cunningham, supra,* 25 Cal.4th 926, 994.)

## DISPOSITION

The judgment is affirmed.

_____
Dondero, J.

We concur:

_____
Margulies, Acting P. J.

_____
Banke, J.

19