[No. A083194. First Dist., Div. One. Nov. 23, 1999.]

THE PEOPLE, Plaintiff and Respondent, v.
MANGO WATTS, Defendant and Appellant.

## COUNSEL

Mark D. Greenberg, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, David P. Druliner, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, and Jill Thayer, Deputy Attorney General, for Plaintiff and Respondent.

## OPINION

STEIN, J.—A jury found that Mango Watts had committed second degree robberies of Eva Birrueta and Christina Gulutz (Pen. Code, § 211), attempted second degree robberies of Cheryl Bishop and Sonia Marin (Pen. Code, §§ 211, 664) and assault with a firearm against all four women (Pen. Code, § 245, subd. (a)(2)). The jury further found true allegations that Watts had been armed with a firearm during the commission of all the offenses (Pen. Code, § 12022, subd. (a)(1)), and that Watts personally had used a firearm in committing the offenses against Cheryl Bishop (Pen. Code, §§ 1203.06, subd. (a)(1), 12022.5, subd. (a)(1)).

Watts appeals from the judgment entered upon the jury's verdict.

### STATEMENT OF FACTS

At approximately midnight on September 3, 1995, three men entered a Lyons restaurant and lounge. Between them they robbed at gunpoint two employees, Eva Birrueta and Christine Gulutz, and attempted to rob at gunpoint two other employees, Sonia Marin and Cheryl Bishop. The three men later were identified as Mango Watts, Jonathan Shaw and Bobby Dues. The jury determined that appellant, Watts, personally used a firearm in the assault and attempted robbery of Cheryl Bishop, but did not personally use a firearm in connection with the crimes against the other victims. Appellant does not contend that the evidence fails to support the jury's findings that he was involved in the crimes or that he was armed, findings that, in light of the evidence, support the conclusion that he personally used a firearm against one of the victims. Appellant claims, however, that the jury erred in finding that he personally used a firearm against Bishop, as opposed to one of the other victims. We disagree.

## THE EVIDENCE

### Eva Birrueta

Ms. Birrueta was a hostess at the restaurant. On the night in question, three Black men came into the restaurant together. Ms. Birrueta described one of the men as being about the same height as the prosecutor, and slim. He was dressed in a long black jacket, with the hood pulled up over his face. This man grabbed Birrueta around the neck and face, telling her he wanted the money in the cash register. Birrueta tried to pull away. The man hit her on the back of the neck with a heavy object, knocking her to the floor. Birrueta managed to get away, crawling down a hallway towards the lounge. She saw a second man standing by a computer machine that he apparently took to be a cash register. The man was dressed much like the first man, in a long black jacket. A restaurant employee, Ms. Marin, was kneeling on the floor next to him. This second man also had a gun, which he was holding to Ms. Marin's head, trying to get her to open the machine. He struck her with the gun, knocking her to the floor. Ms. Birrueta continued to crawl along the floor to the lounge. There she saw a third man, described by her as slim and about four inches shorter than the prosecutor, dressed like the others, taking money out of the cash register. This man also had a gun, identified by Ms. Birrueta as a black revolver. He was pointing the gun at the bartender, Christine Gulutz. Ms. Birrueta identified appellant, in court, as this third man.

### Cheryl Bishop

Ms. Bishop was the manager of the Lyons restaurant. Shortly before midnight on September 3, 1995, Ms. Bishop heard some noise from the bar area. Someone was shouting, "Get down. Get down on the floor." Ms. Bishop started to go towards the reception area. She saw a man with a black gun. His hands were in the cash register. The man told Ms. Bishop to get down on the floor. She did so, lying on her stomach. A short time later, a man tapped Ms. Bishop on the arm, telling her, "Get up. We're going to the safe." This man also had a gun. Ms. Bishop walked in front of the man through the kitchen and into the office. The man told her to open the safe. Ms. Bishop missed the correct combination the first time. The man put his gun against her temple, telling her that he was going to count to five and she had better have the safe opened. A moment later someone yelled, "Come on. Forget it. Let's get out of here." The man with Ms. Bishop left. Ms. Bishop was unable to describe either the man who was robbing the cash register in the reception area or the man who took her back to the office. The robbers obtained approximately $1,500 from cash registers in the reception area and the lounge.

*Christine Gulutz*

Ms. Gulutz was the bartender at the Lyons restaurant. On the night in question she heard a commotion in the front, and heard a woman scream. A man with a gun ran from the reception area into the lounge. He was Black and dressed in a black parka. The parka may have had a Raiders insignia on it. The man was several inches shorter than the prosecutor. The man pointed the gun at Ms. Gulutz, telling her to give him the money. Ms. Gulutz opened the register. The man took the money from the register and all the money from a nearby tip jar. He told Ms. Gulutz to get down on the floor, and she did so. The man did not hit or kick her, but he did throw a glass cup by her and threw the tip jar down by her head.

*Sonia Marin*

Ms. Marin was a waitress at the Lyons restaurant. On September 3, 1995, shortly before midnight, Ms. Marin heard screaming coming from the reception area. A lot of people were running through the restaurant. Ms. Marin began to run, too. A voice behind her said "Get down on the ground." Ms. Marin continued to run, but another man appeared in front of her. Ms. Marin turned around and got down onto her knees. The man who had told her to get on the ground was Black and dressed in a dark-colored starters jacket, possibly a Raiders jacket. The hood was up. He appeared to be approximately the same height as the prosecutor. He was carrying a black gun with a long barrel. He pointed the gun at Ms. Marin, telling her to give him the money, indicating that she should get money from a nearby "DTS" machine. Ms. Marin told him that the machine had no money. He demanded that she identify the person who had the money. She responded that the lady up front would have it, meaning either the hostess or the manager. The man told Ms. Marin to get up. When she refused, he hit her on the side of the head with the gun and pointed the gun in her face, telling her again to get up. The man followed Ms. Marin to the front where Ms. Marin pointed out Ms. Bishop, who was lying on the ground. The man told Ms. Bishop to get up, and told Ms. Marin to get down. He walked away with Ms. Bishop. A short time later Ms. Marin saw two of the robbers run off.

*Dawn McGhie*

Ms. McGhie testified that she and a friend, Michelle Jackson, were patrons in the lounge area of the restaurant at the time it was robbed. Ms. McGhie described the robber as somewhat shorter than the prosecutor and dressed in a bulky black starters jacket with a Raiders insignia. He carried a long, flat black gun. At some point, Ms. McGhie saw a second man, taller

than the first, take a woman behind the bar. This man also wore a starters jacket, this one with a Kings logo. The second man was also carrying a long black gun. He yelled at the woman. Ms. McGhie saw him hit the woman on the side of the head with the gun, and kick her after she fell to the ground. A third man, similarly dressed, came out of the kitchen area. The first man yelled something like "Let's go. Let's get out of here," and all three men ran out of the lounge. Ms. McGhie recognized the second robber—the one she had seen hit and kick the woman—as Jonathan, or "Pee-Wee" Shaw, a man who lived in Ms. Jackson's apartment complex. Ms. McGhie did not recognize either of the other robbers, but as the third man came into view, she heard Ms. Jackson say, "Oh, my God, that's Mango." Ms. McGhie identified appellant as the man identified by Jackson as "Mango."

Sometime later, Ms. McGhie and Ms. Jackson drove to Ms. Jackson's apartment complex. Shortly after Ms. McGhie pulled into a lit parking space, and before she turned off the motor to the car, a man came jogging across the street towards them. Ms. Jackson identified the man as "Mango," telling Ms. McGhie to drive away. Ms. McGhie drove away.

*Michelle Jackson*

Ms. Jackson testified that Jonathan Shaw was a neighbor and friend. She also knew appellant, and knew he lived in the same apartment complex, but she was not friends with him. Ms. Jackson identified appellant in court as Mango Watts.

Ms. Jackson stated that on the evening of September 3, 1995, she and Ms. McGhie went out, ending up at the Lyons restaurant and lounge about 11:40 p.m. Shortly after they settled in a booth, a man with a gun ran into the lounge. The man was wearing a black starter-type jacket with the hood pulled up. The jacket had an Oakland Raiders insignia on it. He appeared to be about five feet ten inches, a few inches shorter than the prosecutor. He yelled at everybody to shut up. He yelled at the bartender to hurry up and get the money. At some point the hood of the jacket fell back and Ms. Jackson saw the man's face. Ms. Jackson recognized the man, but couldn't recall just who he was. The man yelled, "Come on. Let's go." Ms. Jackson noticed a second robber standing near a woman. This man hit the woman on the side of her head, knocking her to the ground, and in the process causing the hood on his jacket to fall back, exposing his face. Ms. Jackson recognized this man as Jonathan Shaw. He was wearing a black Kings jacket. He kicked the woman after knocking her down. The man behind the bar continued to yell that they should leave. A door that led back into the kitchen area opened and Ms. Jackson saw a third man, whom she recognized as appellant. This man

was wearing a blue Kings jacket. The man ran by Ms. Jackson, enabling her to have a clear view of his face. The three men left together. Ms. Jackson left a short time later with Ms. McGhie. They drove into the parking lot of Ms. Jackson's apartment complex. Ms. Jackson noticed a station wagon belonging to appellant's mother parked across the street. Appellant was standing there with another man, and two men were in the backseat of the car. Appellant started running across the street towards the two women, and the two women drove away.

### Detective Carol Edmonds

Detective Edmonds investigated the robberies. At some point Ms. Jackson told her she believed appellant and Shaw to have been involved in the crimes. Detective Edmonds showed Ms. Jackson a photographic lineup that included both appellant and Shaw. Ms. Jackson identified both men by name, telling Detective Edmonds that she was 99 percent certain that they were involved in the robbery.

## DISCUSSION

## I.

### Sufficiency of the Evidence

 In returning a verdict finding that appellant personally had used a firearm in connection with the attempted robbery and assault of Cheryl Bishop, the jury necessarily found that he was the man who took Bishop back into the office and demanded that she open the safe. This finding is consistent with the testimony of Ms. Jackson, supported by the testimony of Ms. McGhie, that appellant was the man who emerged from the kitchen just before all three robbers ran from the restaurant. Appellant contends, however, that this evidence is inherently improbable because Ms. Jackson and Ms. McGhie also testified that they saw a different man hit and kick an employee, and were able to identify this man as Jonathan Shaw. Sonia Marin testified that she was hit by one of the robbers, and that the man who assaulted her was the same man that took Bishop back into the office. Appellant emphasizes other inconsistencies in the witnesses's testimony, such as Marin's testimony that she never was kicked by anyone.

 The rule was stated in *People v. Ozene* (1972) 27 Cal.App.3d 905, 910 [104 Cal.Rptr. 170]: "It is blackletter law that any conflict or contradiction in the evidence, or any inconsistency in the testimony of witnesses must be resolved by the trier of fact who is the sole judge of the credibility of the

witnesses. It is well settled in California that one witness, if believed by the jury, is sufficient to sustain a verdict. To warrant the rejection by a reviewing court of statements given by a witness who has been believed by the trial court or the jury, there must exist either a physical impossibility that they are true, or it must be such as to shock the moral sense of the court; it must be inherently improbable and such inherent improbability must plainly appear." (See also *People* v. *Breault* (1990) 223 Cal.App.3d 125, 140-141 [273 Cal.Rptr. 110]; *In re Paul C.* (1990) 221 Cal.App.3d 43, 54 [270 Cal.Rptr. 369].) It also is true that uncertainties or discrepancies in witnesses' testimony raise only evidentiary issues that are for the jury to resolve. (*People* v. *Glaude* (1983) 141 Cal.App.3d 633, 641 [190 Cal.Rptr. 479].)

 We find no inherent improbability in Ms. Jackson's testimony that appellant was the third man that came out of the kitchen and was not the man that robbed Ms. Gulutz or the man that struck Ms. Marin. It is abundantly clear that the crimes created a state of panic and pandemonium and that things happened very rapidly. It would not be at all surprising if Ms. Marin incorrectly identified the man who assaulted her as the man that took Ms. Bishop back into the office. It also would not be particularly surprising if Ms. Jackson misidentified exactly who was assaulting which victim at a given moment. The evidence is that during much of the time Ms. Jackson was attempting to get under a table. At the end, however, Ms. Jackson remembered recognizing Shaw, and seeing appellant emerge from the kitchen. The surprise of recognition would be something that Ms. Jackson reasonably would remember, and the jury had every reason to view that evidence as highly credible. There is no reason here to second-guess the jury's finding.

## II.

### *Effect of Prosecution and Conviction of Shaw for Crimes Against Ms. Bishop*

 Some years before the trial in this case, Jonathan Shaw was tried for his participation in the crimes. The prosecution's theory in that case, based on the evidence adduced there, was that Shaw was the person who personally used a firearm in committing the crimes against Ms. Bishop. Appellant contends that his conviction of the same offense violates due process and the doctrine of judicial estoppel, correctly pointing out that under any version of the evidence, only one man actually held a gun to Ms. Bishop's head as she attempted to open the safe.

At first blush, the action of the prosecutor in seeking a conviction against appellant for certain crimes after having secured a conviction against Shaw

for the same crimes, is troubling. ■ The prosecutor, after all, " 'is the representative not of any ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done." ' [Citations.]" (*People* v. *Fierro* (1991) 1 Cal.4th 173, 208 [3 Cal.Rptr.2d 426, 821 P.2d 1302].) Thus, ". . . the prosecutor must execute the duties of this representative office diligently and fairly, avoiding even the appearance of impropriety that might reflect poorly on the state." (*People* v. *Trevino* (1985) 39 Cal.3d 667, 682 [217 Cal.Rptr. 652, 704 P.2d 719], disapproved on other grounds in *People* v. *Johnson* (1989) 47 Cal.3d 1194, 1216-1221 [255 Cal.Rptr. 569, 767 P.2d 1047].)

■ On further reflection, however, it appears only that appellant was charged with, and convicted of, crimes that the evidence showed him to have committed. There is no indication that the prosecution caused the witnesses to change their testimony from that given during the prosecution of Shaw, or that the prosecutor otherwise acted improperly in securing appellant's conviction. Although it is true that only one offender could have committed the specific acts against Bishop, the nature of trial proceedings, the nature of the crimes and the nature of the evidence of those crimes, make it perfectly possible that appellant was the individual who committed the crimes, notwithstanding that some other jury, in some other prosecution, concluded that they were committed by Shaw.

*Due Process*

■ Prosecutors have broad discretion to decide who to charge, and for what crime. That discretion is limited in that a prosecutor may not bring criminal charges against an individual without probable cause to believe that the charges are valid. (*People* v. *Trevino, supra,* 39 Cal.3d 667, 681.) In addition, a defendant has a right to be free from invidious discrimination or vindictive prosecution. (*People* v. *Lucas* (1995) 12 Cal.4th 415, 477 [48 Cal.Rptr.2d 525, 907 P.2d 373].) Aside from such matters, however, there are no constitutional restrictions on a district attorney's discretion to prosecute a particular defendant for a particular crime. (*People* v. *Lucas, supra,* 12 Cal.4th at p. 477.) ■ In the present case, and notwithstanding the fact that Shaw earlier was found to have personally used a firearm in connection with the offenses against Ms. Bishop, there is nothing to suggest that the prosecutor lacked probable cause to believe that appellant in fact was the individual who used a firearm against that victim. It has been held that improper governmental conduct warrants dismissal of an information only if it is so grossly shocking and so outrageous as to violate the universal

sense of justice. (*U.S.* v. *Doe* (9th Cir. 1997) 125 F.3d 1249, 1254.) That standard simply was not met here. Indeed, the evidence adduced at trial, which presumably was available to the prosecutor prior to trial, tends to support the conclusion that the jury in the earlier trial was mistaken. The "universal sense of justice" does not require a prosecutor to forgo prosecuting an individual for a crime when there is probable cause to believe he committed that crime just because it also appears that someone else may have been mistakenly convicted of the same crime.[1]

We conclude that the prosecutor's decision to charge appellant therefore comported with due process.

The remainder of the proceedings also were consistent with due process. Appellant was notified of the charges against him, was given a fair trial and, as discussed above, was convicted on the evidence. There is no contention but that appellant received all procedural rights to which he was entitled. It is true that the misconduct of a prosecutor may provide a basis for reversal on due process grounds if the prosecutor, by the use of deceptive or reprehensible methods to persuade either the court or the jury, rendered the trial fundamentally unfair. (*People* v. *Samayoa* (1997) 15 Cal.4th 795, 841 [64 Cal.Rptr.2d 400, 938 P.2d 2].) Here, however, there is no suggestion that the prosecutor somehow manufactured or manipulated the evidence in order to obtain a conviction in appellant's trial,[2] and again, the evidence supports appellant's conviction. We can find nothing reprehensible about pursuing a theory supported by the evidence, and nothing fundamentally unfair about securing a conviction upon that evidence.

It follows that appellant's conviction is not subject to reversal on due process grounds.

*Judicial Estoppel*

 The doctrine of judicial estoppel essentially acts to prevent a party from abusing the judicial process by advocating one position, and later, if it becomes beneficial to do so, asserting the opposite. The doctrine is designed

---

[1]One could not fault a prosecutor, for example, for prosecuting a defendant who confessed to a crime and the evidence supported that confession, notwithstanding that some other person earlier had been convicted of the crime.

[2]Appellant suggests that the prosecutor chose to argue that appellant personally committed the acts against Ms. Bishop because the acts committed by her assailant were particularly heartless. The acts of the other assailants, however, in pistol-whipping Ms. Birrueta and throwing the tip jar down near the head of Ms. Gulutz after robbing her at gunpoint, demonstrated a like callousness. In any event, the prosecutor's argument simply adopted the testimony of the witness who knew appellant.

not to protect any party, but to protect the integrity of the judicial process. (*Jackson* v. *County of Los Angeles* (1997) 60 Cal.App.4th 171, 181 [70 Cal.Rptr.2d 96].)

It has been stated that the doctrine has not been applied against the prosecution in criminal actions (see *Nichols* v. *Scott* (5th Cir. 1995) 69 F.3d 1255, 1272; *U.S.* v. *McCaskey* (5th Cir. 1993) 9 F.3d 368, 378; *U.S.* v. *Kattar* (1st Cir. 1988) 840 F.2d 118, 129-130, fn. 7),[3] and neither party has cited, nor has independent research uncovered, a case where the doctrine actually has been applied to grant some form of relief in a case such as this. Nonetheless, it has been postulated that the doctrine might apply where a prosecutor's assertion of inconsistent theories would act to undermine society's confidence in the fairness of the process (*Thompson* v. *Calderon* (9th Cir. 1996) 109 F.3d 1358, 1371), and two cases have at least entertained the possibility that the doctrine might apply if the prosecution pursued wholly irreconcilable theories in attempting to secure a conviction against two defendants at two different trials.

In *Thompson* v. *Calderon, supra,* 109 F.3d 1358, the prosecution's theory was that Thompson had murdered the victim. In a second case, however, the prosecution's theory apparently was that another man, Leitch, had murdered the victim. The appellate court rejected Thompson's claim for relief on judicial estoppel grounds, noting that during the Leitch trial the prosecutor had not attempted to exonerate Thompson from complicity in the murder, and thus had not taken a position inconsistent with the prosecution of Thompson for the crime. The court did suggest, however, that Leitch might be entitled to some form of relief if, after relying on the evidence of Leitch's hostility towards the victim during the prosecution of Leitch, the prosecution at Thompson's trial had attempted to discredit the same evidence as a means of supporting the case against Thompson. (*Id.* at pp. 1371-1372.)

In *Drake* v. *Francis* (11th Cir. 1984) 727 F.2d 990, the prosecutor had secured a conviction of one Campbell for the murder of the victim, theorizing that Campbell was the sole murderer, although Drake had been involved in a related robbery. In a later prosecution of Drake for the murder of the

---

[3]The most common application of the doctrine probably is in employment cases. Courts have used it to deny relief to an employee who obtains workers' compensation for "total disability," and then seeks to recover damages from his or her employer on a basis inconsistent with an assertion of total disability, such as that he or she is a qualified person with a disaoility entitled to reasonable accommodation from the employer under the Americans with Disabilities Act of 1990 (42 U.S.C. §§ 12101-12213), or that he or she was terminated by the employer for age discrimination. (See *Dush* v. *Appleton Elec. Co.* (8th Cir. 1997) 124 F.3d 957, 961-962; *Rissetto* v. *Plumbers and Steamfitters Local 343* (9th Cir. 1996) 94 F.3d 597, 605-606.)

same victim, the prosecutor theorized that Campbell was physically unable to deliver the fatal blows to the victim, and that Drake, therefore, must have participated in the murder. The appellate court rejected Drake's judicial estoppel argument, pointing out that because the theory at each trial had been that both defendants were involved in the murder robbery, the murder theories asserted by the prosecutor in the respective trials were reasonably consistent. (*Id.* at p. 994.) The court did, however, note that if anyone was entitled to relief it would be Campbell, because Campbell was convicted and sentenced to death by a prosecution that subsequently contended that he was too old and sick and weak to commit the crime. (*Id.* at p. 994, fn. 4.)

▌ Neither cited case establishes that the doctrine of judicial estoppel should apply to cases such as this, and it is our opinion that it should not. The doctrine of judicial estoppel should not act to prevent the state from taking inconsistent factual positions in separate proceedings, or at least it should not do so absent some indication that misconduct on the part of the prosecutor was a cause of the inconsistency. That the evidence adduced during one proceeding provides proof that one thing in fact occurred, while the evidence adduced during a second proceeding provides proof that a different thing in fact occurred, is an unavoidable risk of the judicial process. The prosecutor's theory in a given proceeding necessarily is based on what the prosecutor learns prior to, and during, that proceeding. The prosecutor, after all, was neither a participant nor a witness, and has no knowledge of the facts other than those gleaned from the witnesses and other available evidence. Thus, the prosecutor's argument is not that a particular set of facts is the true set of facts; but that the *evidence shows* that a particular set of facts is the true set of facts.

It is settled that the related doctrine of collateral estoppel does not act to prevent relitigation in a criminal action of an issue decided in an earlier criminal action brought against a different defendant. In *Standefer* v. *United States* (1980) 447 U.S. 10 [100 S.Ct. 1999, 64 L.Ed.2d 689], the Supreme Court noted that the application of collateral estoppel in such cases is unwarranted, in part, because the criminal law rules of evidence and exclusion may have prevented the admission of evidence in the first proceeding, which, when admitted in the second proceeding, supports a different view of the facts. (*Id.* at pp. 23-24 [100 S.Ct. at p. 2008].) In so concluding, the court stated a principle applicable both to a claim of judicial estoppel and to a claim of violation of due process. "[W]e do not deviate from the sound teaching that 'justice must satisfy the appearance of justice.' [Citation.] This case does no more than manifest the simple, if discomforting, reality that 'different juries may reach different results under any criminal statute. That is one of the consequences we accept under our judicial system.' [Citation.]

While symmetry of results may be intellectually satisfying, it is not required. [Citation.] [¶] Here, petitioner received a fair trial at which the Government bore the burden of proving beyond reasonable doubt that [the charged offenses had occurred]. He was entitled to no less—and to no more." (*Id.* at pp. 25-26 [100 S.Ct. at pp. 2008-2009].)

Finally, at least one case has adopted reasoning similar to ours on somewhat similar facts. In *State* v. *Ng* (1985) 104 Wn.2d 763 [713 P.2d 63], three armed men entered a club, where they bound, robbed, and killed twelve people. A number of the victims were killed by shots fired from a Ruger .22-caliber gun. The defendant, Ng, was tried for his involvement in the case. The involvement of a second man, Mak, was adjudicated in a separate trial. On appeal, Ng contended that the doctrine of judicial estoppel should apply because the prosecutor had argued at Ng's trial that Ng owned the Ruger, but later argued at Mak's trial that Mak had purchased the gun. The Supreme Court of Washington noted that Mak had testified at his own trial, thereby placing a body of evidence on the record that had not been adduced during Ng's trial. "To require the prosecutor to make identical arguments when the record contains different evidence contradicts the well-established proposition that a prosecutor may argue reasonable inferences from the facts presented at trial." (*Id.* at p. 71.)

In summary, we conclude that the integrity of the judicial process is not compromised by the prosecution of two individuals for the same crime when there is probable cause to support charges against each individual. This is particularly true where, as here, it is clear that both individuals had some criminal involvement in the offense and the nature of their collective actions renders it difficult or impossible for the prosecutor to determine with certainty which individual in fact committed which particular act or crime. We therefore conclude that the doctrine of judicial estoppel affords no relief to appellant.

### III.

*Penal Code Section 654*

As relevant here, Penal Code section 654 prohibits multiple punishments for offenses committed during a single course of conduct if the offenses were incidental to a single objective. (*People* v. *Latimer* (1993) 5 Cal.4th 1203, 1208 [23 Cal.Rptr.2d 144, 858 P.2d 611].) In the present case, the trial court concluded that the robberies were separate from the assaults and imposed separate punishments for each. Appellant contends that the imposition of separate punishments was error because the assaults and

robberies were but part of a single course of conduct, arguing that the assaults were committed with the intent to commit robbery and as the means of committing the robberies.

Whether a defendant held multiple criminal objectives presents a question of fact, and the trial court's finding on that question will be upheld if it is supported by substantial evidence. (*People* v. *Avalos* (1996) 47 Cal.App.4th 1569, 1583 [55 Cal.Rptr.2d 450].) As to the victims here, there was evidence that each was assaulted either as she was attempting to comply with her assailant's demand for money or was attempting to escape. Ms. Birrueta was struck as she was attempting to pull away. Ms. Marin was struck after she told her assailant where to find the money and as she was lying on the floor. A gun was placed against Ms. Bishop's head after she complied with her assailant by taking him to the back office and attempting to open the safe. Ms. Gulutz's assailant threw a glass cup by her, and the tip jar near her head, after she had complied with his demands to open the cash register. The evidence accordingly shows that the robberies were well under way at the time the assaults occurred, and thus supports the conclusion of the trial court that the assaults therefore were not simply a means of committing the robberies. Substantial evidence therefore supports the trial court's conclusion that the assault of each victim was not merely incidental to the objective of robbing that victim, but a separate act with a separate objective. It follows that the court was entitled to impose separate sentences for each assault and each robbery.

The judgment is affirmed.

Strankman, P. J., and Marchiano, J., concurred.

Appellant's petition for review by the Supreme Court was denied February 23, 2000. Mosk, J., and Kennard, J., were of the opinion that the petition should be granted.