Filed 12/1/25  In re C.P. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re C.P. et al., Persons Coming Under the Juvenile Court Law. | |
| MERCED COUNTY HUMAN SERVICES AGENCY, Plaintiff and Respondent, v. J.P., Defendant and Appellant. | F088840 (Super. Ct. Nos. 24JP-00074-A, 24JP-00074-B) **OPINION** |

-ooOoo-

APPEAL from orders of the Superior Court of Merced County.  Donald J. Proietti, Judge.

Roni Keller, under appointment by the Court of Appeal, for Defendant and Appellant.

Forrest W. Hansen, County Counsel, and Jennifer Tran, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

Appellant J.P. (mother) is the adoptive mother of Colton P. and Jessica P. (collectively, the children), who are the subjects of this dependency case.[1] Mother challenges the juvenile court's orders issued at a jurisdiction and disposition hearing that resulted in the removal of the children from mother's custody. Mother contends there was not substantial evidence to support the court's finding that Colton was described by section 300, subdivision (i) based upon acts of cruelty by mother. We affirm.

**FACTS**

### Initial Removal

Colton, at 16 years of age, was located by law enforcement after he ran away from home. Colton told law enforcement that his adoptive brother, Tyler P., inflicted injuries on him at the direction of mother. Colton had a bruise on his left elbow, a large cut on his right side, a cut from the back to the front of his rib area, and a burn mark on his left arm.

A social worker from the Merced County Human Services Agency (agency), Martha E., responded to complete a joint investigation with law enforcement. The evidence obtained from the investigation was set forth in the agency's detention report. Colton made several allegations of mistreatment by mother, and he insisted that he would continue to run away if returned to mother's home. Colton stated mother made him rewrite letters several times, and he was not allowed to eat until he wrote the letters to mother's satisfaction.

Mother also reportedly withheld acne medication after the medication bleached a washcloth. Colton's acne was causing scarring to his face, and he was embarrassed by his severe acne. Mother teased him about his ongoing acne problems, and the agency noted mother withheld appropriate medical treatment. Colton indicated mother also teased him about being sexually abused when he was in foster care. Mother would tell

---

[1]     The children were originally placed in mother's home in August 2017 as a foster care placement. The adoption of the children was finalized in December 2020.

2.

Colton that he was lying about being raped, which reportedly added to Colton's feelings of depression and shame from the incident.

The children each reported that mother would withhold food from them as a form of punishment. Mother would force the children to eat leftover oatmeal with chia seeds for lunch if they did not finish their oatmeal during breakfast. Colton stated he would need to sneak in the shower on occasion because mother would refuse to let him shower as a form of punishment. The children also reported that they were frequently grounded and unable to leave the home. Mother would require the children to stand in their bedrooms for hours, and she would monitor them on cameras. There were cameras set up in every room of the house, including the children's bedrooms.

Colton shared a bedroom with Tyler, mother's 22-year-old biological son, who was at least a foot taller and 40 pounds heavier than Colton. Colton's injuries were inflicted during a fight with Tyler on July 4, 2024. Tyler became upset after Colton knocked loudly on the locked bedroom door. Colton stated Tyler threatened to kill him during the incident, and Tyler would regularly threaten to kill him.

Colton described his current depression as an overwhelming sadness that occurred a few times each month. He believed mother was the cause of his depression. Mother would regularly tell him that he was a horrible person who was likely to end up in prison. Colton ran away from the home on two previous occasions. In June 2024, Colton jumped from the second-floor window to leave the home, but he recanted his report of abuse because he did not believe the police officer would keep him safe. The abuse initially began after the adoption was finalized and social workers stopped coming to check on the children's wellbeing. Colton no longer felt safe in the home, and he would do "anything" to get out of the home. Colton believed mother recently began treating Jessica better so that she would support mother's version of events.

Jessica denied having any self-harming behaviors, but she acknowledged that she had a habit of picking at her skin. Jessica stated Colton was the cause of the problems in

3.

their home.  She indicated Colton would sneak downstairs to get food or watch television, which resulted in mother locking up the refrigerator, pantry, and television remotes.

Social worker Martha E. discussed the allegations with mother during the investigation.  Mother initially claimed she witnessed the " 'fist fight' " between Colton and Tyler.  However, mother insisted she woke up after the incident when Martha questioned mother about her lack of intervention.  Mother believed Colton was responsible for the incident, and she insisted that he was aggressive despite the absence of any visible injuries on Tyler.  Mother disciplined Colton for the incident by forcing him to sleep on a thin yoga mat on Jessica's bedroom floor.  She stated Colton was "too disgusting" to be allowed to sleep on the beds in the room.

In her conversations with Martha, mother justified all her punishments of Colton.  She claimed Colton lied often and had a history of being violent.  Mother stated she did not enjoy or want to talk to Colton.  Martha was shown two different refrigerators with locks on them.  The refrigerator inside the home had several drinks with initials written on them, but none of the drinks had Colton's initials.

Mother indicated she locked the refrigerator when she went to bed at 9:00 p.m. to prevent Colton from taking snacks or drinks from other members of the household.  Colton was not allowed to go into the first level of the home after mother went to bed.  Mother insisted there was fruit on the kitchen counter if Colton needed a snack at night, but she could not provide an explanation when Martha pointed out that he was not allowed to access the kitchen after 9:00 p.m.  Martha inquired about a bowl of hardened oatmeal on a kitchen shelf, and mother explained that Colton would finish his leftover oatmeal breakfast at lunchtime.

Mother informed Martha that these disciplinary methods were used to "help" Colton.  She attempted to obtain services from Merced Behavioral Health, but Colton did not meet the criteria for services.  Mother stated Colton was in counseling in May 2024 to help with his anger and lying.  However, mother claimed nothing helped with Colton

4.

because he " 'just gets worse.  Never better.' "  Mother denied using physical discipline in the home.  She deprived the children of electronics and privileges as forms of discipline.

Martha observed that mother did not appear to be emotionally bonded to the children.  Mother could not recall the date of the children's adoption, but she stated her financial payments decreased significantly after the adoption was finalized.  Mother refused Martha's request for Colton to come into the home to pack personal items and clothing.  She indicated that she was afraid of Colton stealing items from Tyler.  The children were taken into protective custody by law enforcement on the date of Martha's initial investigation.

The detention report also set forth details from two referrals received earlier in 2024.  In February 2024, the agency received a referral alleging mother physically abused Jessica.  It was reported that mother made Jessica stand for hours, punched Jessica in the stomach, grabbed her face, and forced her to eat old food.  Jessica ran away from the house multiple times, and she felt that no one would believe her disclosures of abuse.  Mother avoided the social workers who responded to her home on multiple occasions, which resulted in the referral being deemed inconclusive.

In June 2024, the agency received a referral alleging mother was physically and emotionally abusive towards Colton.  Colton reported ongoing physical abuse for the past three years.  It was reported that mother jabbed her nails into Colton's chest, kept him home from school to avoid any reporting of the abuse, and punished him for using the restroom at night.  Colton also reported that he was forced to sleep on Jessica's floor for two weeks as a punishment.  The referral was determined to be unfounded after Colton recanted his statements.

On July 10, 2024, the agency filed a petition alleging Colton was described by Welfare and Institutions Code section 300, subdivisions (b)(1), (c), and (i).[2]  The petition

---

[2]     All further statutory references are to the Welfare and Institutions Code.

further alleged that Jessica was described by section 300, subdivision (b)(1). The allegations stated Colton had been subjected to acts of humiliation, ostracism, and food restrictions by mother. The supporting facts included the injuries inflicted by Tyler and Colton's suffering of depression and anxiety. The forms of discipline identified in the allegation pursuant to section 300, subdivision (i) included the following: 1) sleeping on a yoga mat, 2) rewriting letters, 3) withholding of food, 4) restrictions on movement around the home, 5) taunting regarding previous sexual abuse, 6) limitations on showering, 7) standing in bedrooms for hours while monitored by cameras, and 8) locking refrigerators at night.

At the initial detention hearing held on July 11, 2024, the children were ordered detained from mother, and a jurisdiction and disposition hearing was set for August 1, 2024.

### *Jurisdiction and Disposition*

The initial jurisdiction and disposition hearing was continued multiple times to allow the agency additional time to prepare its report. On August 28, 2024, the agency filed a jurisdiction report, which recommended the allegations in the petition be found true. The children were placed into two separate resource family homes due to a conflict between them at the time of removal.

Jessica was interviewed by an agency social worker on July 29, 2024. The social worker inquired about the reason Jessica was in foster care, and Jessica indicated that her brother made up a " ' whole bunch of lies.' " Jessica did not observe the physical altercation between Tyler and Colton, but she heard Colton yelling when Tyler refused to let him in the bedroom. The incident was the first fight between Tyler and Colton.

The social worker asked about the rules in mother's home. Jessica explained there were daily chores and their belongings were taken away if they did not follow the house rules. The children were required to eat oatmeal in the mornings when they were punished. Jessica felt upset because Colton's " 'lies' " caused their removal from the

home.  The social worker noted that Jessica appeared worried as she spoke softly and fidgeted with her hands during the interview.  Jessica and Colton were not currently speaking, and she did not want to see him during visits.

Another social worker, Angelina R., interviewed Colton at his resource family home on August 12, 2024.  Colton provided his recollection of the incident that led to the removal.  He reported Tyler began punching him after Colton knocked on their bedroom door to get blankets.  Tyler then followed Colton to Jessica's room, and he pushed Colton to the floor.  Colton was hit approximately "eight to nine" times all over his body.  Tyler reportedly told Colton that he was going to kill him while digging his nails into Colton's skin.  Colton stated mother was asleep during the incident, but mother still blamed Colton for the incident.  This was the first time Tyler had physically assaulted Colton, but Tyler would yell and scream at Colton if he did not knock before entering their bedroom.

Colton stated mother would feed the children instant ramen noodles without seasoning for lunch each day.  He indicated that he would be punished for using the restroom at night, forgetting to say "yes ma['a]m," using acne wash without permission, and arguing.  Colton felt weak and vomited on occasion.  His first attempt to run away from home was in June 2024, due to Tyler stating that he was going to kill Colton.  According to Colton, mother would tell him, " 'Little shit, stupid, good for nothing, idiot,' " at least 20 times each day.  Colton also reported physical abuse occurring since 2020.  Colton was punched in the face approximately 30 times and his chest was poked by mother's nails on a daily basis.  Jessica's hair was pulled at least eight times each day.

Colton's counseling for depression and anxiety was recently terminated by mother after she told the clinician that Colton no longer needed it.  Colton felt mother stopped the counseling because she was afraid that he would tell his clinician about the abuse.  He suffered from nightmares of returning to mother's care three to four times each week.  Colton believed mother inflicted abuse because he was not her biological child and she only wanted money.  Angelina reviewed the petition and detention report with mother on

August 13, 2024.  Mother disputed the claim that she directed Tyler to hit Colton.  She stated there was an altercation between Tyler and Colton at approximately 11:00 p.m. while she was sleeping.  Mother ran into the hallway and heard Colton yelling from Jessica's room.  Jessica, Tyler, and one of mother's biological daughters reportedly informed mother of the details surrounding the altercation.  According to mother, Colton attacked Tyler for locking their bedroom door.  Mother reported Tyler pushed Colton away and sustained a scratch on his left arm.  She also claimed Colton made the decision to sleep on Jessica's bedroom floor on a mat.

Mother stated Jessica and Colton did not like to follow rules, and the children's negative behaviors increased after she informed them that she had been diagnosed with cancer.  These negative behaviors were reported to include fits of rage, hitting, breaking items, yelling, threatening, slamming doors, and punching walls.  Mother's discipline methods included timeouts, restrictions on electronics, and replacing cereal with oatmeal.  Mother denied that she withheld food as a form of punishment, and she insisted the children ate four meals each day of a wide variety of food types.

In discussing mother's restrictions on food and television at night, she reported Colton was allowed to go downstairs for fruit and water when he was not grounded.  Mother described an incident where Colton broke a saw and hid it, and he was grounded from television as his punishment.  The children were scheduled to shower on Tuesdays, Thursdays, and Sundays.  Mother explained that the children were allowed to take showers on other days if necessary, but Colton reportedly refused to shower.  Mother insisted there were no cameras in the bedrooms, and she reported that the children were only put on timeout for 10 minutes to "cool off" before she addressed their negative behavior.

Mother denied that Colton suffered from depression and anxiety, but she reported he was stressed and scared due to her cancer diagnosis.  She also described Colton as " 'always happy, even when he was grounded.' "  Mother stated that she believed

8.

Colton's reporting of past sexual abuse, and she contacted the agency to make a report of the abuse. Since 2017, the children were receiving weekly counseling services. Mother indicated Colton was diagnosed with oppositional defiant disorder, disruptive disorder, and attention deficit/hyperactivity disorder. She felt Colton wanted the agency to view her as a horrible person, but she did not know why he made up the allegations.

A police report from the Merced Police Department was attached to the jurisdiction report. The report included a narrative of Officer Jennifer Shaw's contact with the family on the date of removal. According to the report, Colton had marks on his upper right rib area, forearm, and left bicep. Colton believed Tyler was going to kill him, and he informed the officer that mother would claim Tyler was disabled due to his status as a dependent adult with autism spectrum disorder.

Shaw responded to mother's home for further investigation. Mother told Shaw that Colton had been "extra horrible" ever since he found out about mother's cancer diagnosis. Tyler informed the officer that Colton became upset when Tyler told him to leave their bedroom. Tyler stated Colton was punching at Tyler, however, Colton never hit Tyler. Tyler admitted to pushing Colton with both hands, and Colton did not fight back. Tyler denied knowing the cause of Colton's bruises and scratches.

Shaw informed mother that the marks on Colton were concerning. Mother claimed Colton made his injuries worse, but Shaw did not see any open cuts or bleeding to suggest that Colton reopened any of the scratches. Shaw requested video footage from a camera in the bedroom, but mother stated the cameras were not functional. Mother claimed Colton ran away from home because he was upset about doing yardwork. Jessica told Shaw that Colton went into her bedroom on the night of the altercation with Tyler. She denied that she was present during the physical altercation.

Mother showed a letter to Shaw that she claimed Colton wrote while he was on timeout. The letter indicated Colton attempted to strangle Tyler, and mother stated Colton expressed an intent to kill Tyler by strangling him. Shaw inquired about mother's

9.

delay in presenting the letter, and she explained that Colton was supposed to be going to "Job Cor[ps]" or a facility.

During Shaw's investigation, it was noted that there were several cameras in the residence, including in the bedrooms. A lock was found on the refrigerator, freezer, pantry, and garage. Shaw questioned Colton about the letter, and he explained that mother directed him to write the letter. Colton was not allowed to eat until he finished the letter. Investigating social worker Martha believed there was enough evidence to detain the children due to mother's severe punishments and food restrictions.

A contested hearing was set at mother's request for September 12, 2024. The agency's disposition report recommended that the children remain in out-of-home care, with family reunification services provided to mother. On September 17, 2024, Colton's counsel submitted a typed statement from Colton regarding his opposition to returning to mother's care. Colton stated that he suffered such significant trauma and anxiety that he could not be in the courtroom with mother.

### Contested Jurisdiction and Disposition Hearing

After a brief continuance, the contested jurisdiction and disposition hearing began on October 2, 2024. The juvenile court took judicial notice of the agency's reports, and mother's counsel submitted a transcription of Shaw's bodycam video footage from the date of the children's removal along with a copy of the video.

<u>Shaw's Testimony</u>

Shaw testified that she responded to a neighbor's home where Colton had run away to. Colton appeared to be clean and properly nourished at the time of the contact.

Colton and Tyler both described their version of events, and mother had not witnessed the altercation. Shaw clarified that Colton informed her that mother directed Tyler to deal with Colton's negative behavior, and mother had not directed Tyler to hit Colton on the date of the incident. Shaw testified that she had no issues with Colton's credibility, and he appeared to be recalling events as they occurred during her interview.

10.

However, Shaw did not believe Jessica was credible because some of her statements appeared to come from mother. Jessica also told Shaw that she got her information about the incident from mother.

Shaw testified that she reviewed and documented Colton's injuries. There were scratches on Colton's ribcage, which were believed to be caused by Tyler's long nails. Colton's forearm, elbow, and bicep each had bruises. Shaw observed no injuries on Tyler. Shaw felt that everybody in the home was against Colton, and none of the family members had anything positive to say about him. Mother provided Shaw with multiple letters that Colton wrote regarding the altercation. Colton indicated that he was not able to eat or use the restroom until he wrote the letters exactly as mother wanted them. Shaw did not believe Colton's sleeping arrangements on Jessica's floor were appropriate. Shaw found it necessary to remove Colton from the home because he was unsafe.

Martha E.'s Testimony

Investigating social worker Martha E. testified that she responded to mother's home to investigate the report of abuse on July 8, 2024. Martha testified that mother did not direct Tyler to hit Colton on the date of the incident, but she acknowledged that the allegation ended up being included in the petition. Martha observed Colton to have proper grooming and hygiene on the date of the removal.

In 2022, Martha investigated a referral involving Jessica after she ran away from the home and made allegations of physical abuse against mother. During the investigation, Martha observed Jessica digging her nails into another finger, which caused bleeding. Jessica appeared to believe that she would be able to switch to a different foster home, but Martha explained that was no longer the case after the adoption was finalized. Colton denied that anyone was being abused in the prior investigation, and he claimed Jessica was lying. The agency offered services to mother, and the investigation was closed after mother declined them.

11.

On cross-examination, Martha explained that targeted child syndrome involved families that focus on one child to direct their aggression or control. In such cases, the individuals in the home blame any problems of the household on one child. In her opinion and experience, Martha believed Colton was the targeted child in the household due to the negative statements mother made about Colton. She believed the target had moved from Jessica to Colton after Jessica reported abuse two years earlier. Martha also believed that prohibiting Colton from sleeping on the available beds in the home was a concern.

Martha testified that mother initially claimed to have witnessed the altercation between Colton and Tyler. However, she eventually stated that she was asleep. Mother continued to insist that Colton was the aggressor, which further supported Martha's belief that Colton was the targeted child. Martha testified that neglected children often develop a fear of food insecurity, and putting a lock on a refrigerator was not an appropriate response to children exhibiting such behaviors. In Martha's opinion, mother caused Colton embarrassment by denying him acne medication, and her teasing about suffering sexual abuse while in foster care resulted in feelings of depression for Colton. Martha indicated she did not investigate mother's claims that Colton had a history of violence and lying.

Jessica's Testimony

Mother's counsel called Jessica as her next witness. Jessica testified that mother was "nice" and they did "fun stuff together." She denied feeling unsafe, and she wanted to return to mother's home. Jessica had lived in the home since she was six years old, and she was adopted at the age of 10 by mother. There were six siblings that lived either in mother's home or in a home across the street. Jessica testified that she had a "[g]ood and close" relationship with her other siblings. She witnessed Colton lose his temper sometimes, and he would say "mean stuff" to her on occasion.

12.

Jessica testified that she ran away from the home in 2022 because she did not like the rules in the home. The types of rules that she did not like were no running in the house or jumping on furniture. On cross examination, Jessica testified that she had never seen Colton punch a wall, but she explained that she had heard him punch a wall within the last six months.

Social Worker Lisa W.'s Testimony

The social worker responsible for investigating the June 5, 2024 referral, Lisa W., was called to testify by mother. Lisa responded to Colton's school to investigate allegations of emotional abuse by mother. She was informed about Colton leaving the home at 2:00 a.m., and there were allegations of discipline that was "different." The school resource officer did not believe it was necessary to detain Colton based upon the allegations.

After the investigation was complete, Lisa spoke to Colton and mother at their home. Colton approached Lisa and indicated that he lied about the abuse. He clarified that many of his statements were exaggerated. Lisa found Colton to be credible both when he originally reported the abuse and when he later apologized for lying about the abuse.

Mother lifted Colton's grounding, and they hugged as Colton was going to start with a "clean slate" at Lisa's suggestion. Mother explained that Colton had previously been grounded indefinitely for sneaking food and breaking a vintage doll. Colton acknowledged that he had taken snacks from the refrigerator at night when he was hungry. Colton had initially told Lisa that mother used Jessica's bedroom for his timeouts, and there were two cameras in Jessica's bedroom and a sound machine outside the door. Colton complained that he could not sleep with the sound machine on, but mother insisted that it was soothing to him.

Angelina R.'s Testimony

Mother's next witness was social worker Angelina R. Angelina interviewed Colton for the preparation of the jurisdiction report in August 2024. She was responsible for writing the jurisdiction report, and she was "very specific" in writing what Colton said during her interview. Angelina testified regarding Colton's statements about the altercation with Tyler and discipline in mother's home.

Colton's Testimony

Colton testified at the request of mother, but the juvenile court granted his counsel's request to testify outside of mother's presence. Colton had been in foster care since he was approximately three years old. He had lived in four to five foster homes before being placed with mother in September 2017. Mother treated Colton well "at first," but he testified that mother started "spiraling" after he was adopted in December 2020. Jessica ran away from the home on three prior occasions, and he ran away from the home twice. Colton believed Jessica ran away from the home because of "abuse."

Colton described the abuse as "[s]leeping on the floor, not letting us get food, not letting us use the restroom at nighttime, locking us in the rooms, putting cameras in the bedrooms to watch us to see if we leave. Basically, not letting us outside. Keeping us—making us stand in a corner in a room for hours and hours. Staying in a room all day." He did not report any of the abuse during Jessica's last attempt to run away because he feared that law enforcement would not remove them. He chose to remain on mother's side when Jessica reported similar abuse. Colton testified that he lied because he believed mother and her biological daughter, Susan P., would "take it out on [him]."

Colton explained that he only recanted his disclosures of abuse in June 2024 because he did not believe law enforcement was going to remove him from mother's custody. On the date of his removal, Colton indicated that he ran from the home because

14.

he had signs of abuse on his body from the altercation with Tyler. Colton described the incident where Tyler chased him into Jessica's room and started punching him.

Colton also testified that mother locked up refrigerators and cabinets to prevent him from accessing food in the home. The food was locked up as a punishment for using the restroom while mother was sleeping. Colton testified that he was only allowed to use the restroom after she woke up in the morning. He indicated there were cameras everywhere in the home, and mother had even required him to take cameras into the bathroom to make sure he was not drinking water. All the mistreatment resulted in feelings of depression, sadness, anger, and hopelessness for Colton. Since his removal, Colton testified that his grades had improved, and he loved his current foster home.

Susan P.'s Testimony

Mother's adult daughter Susan P. testified on mother's behalf. She explained that members of her family wrote their initials on their own food since she was born. Locks were put on the refrigerators to prevent Colton from eating other people's food and snacks at night. Mother wanted to "remove the temptation" for Colton to sneak downstairs at night by placing locks on the food and television remotes. Susan testified that mother was unable to obtain counseling services for Colton after he struggled to cope with mother's cancer diagnosis. Susan denied witnessing the altercation between Colton and Tyler, but she testified that she heard Colton scream, " 'I'm going to kill you,' " at Tyler. Susan also testified that Colton would choose to sleep on Jessica's floor when he wanted to go to bed early. She also denied that the children were forced to stand in their bedrooms for long periods of time.

A.P.'s Testimony

Mother's adult son A.P. testified that he lived across the street from mother's home. The children had counselors and social workers at the home "all the time" when the children were initially placed in the home. A.P. did not believe either of the children was treated more favorably than the other. He was called over to the house on the night

of the altercation between Colton and Tyler. A.P. testified that he heard Colton screaming something about "strangling and killing" when he arrived at the home. A.P. insisted that the house rules were the same for the children as when he was growing up, but he acknowledged that there was no lock on the refrigerator or cameras inside the home when he lived there.

Gabrielle F.'s Testimony

The children's former court-appointed special advocate from their previous dependency proceedings, Gabrielle F., testified that the children had multiple placements while in foster care. The children had wraparound services, and they displayed a lot of behavior changes over the years. The services eventually terminated once the children's behaviors improved. Gabrielle learned that there were a lot of "bad things" going on in one of their foster homes, but the children did not tell her about any of the problems until after they were removed from that foster home. Gabrielle testified that children might be too scared to talk about problems in a home while they are living there.

Mother's Testimony

Mother testified as the final witness at the contested hearing. Mother had six biological children who were supportive of her becoming a foster mother, and she became a certified foster parent in 2012. She had provided care for six foster children, and she denied having any allegations of abuse made against her prior to Colton and Jessica. Mother testified that the children did not know basic house rules when they were initially placed in her care. She tried to ignore negative behaviors and praise positive behaviors in the children.

The children's behavioral issues were well known to mother at the time of their adoption. Mother required the children to take showers on Tuesdays, Thursdays, and Sundays because they did not want to take showers when initially placed with her. She claimed the children's behaviors deteriorated after they were told about her cancer

16.

diagnosis. Mother testified that Colton wanted to go to Job Corps and establish his independence instead of following the house rules.

Mother told Colton that she was only locking up the refrigerator and television remotes to "take away the temptation" and help him avoid being grounded. Mother acknowledged that locking up the refrigerator was not the right course of action because it took away his safety net of knowing that he had access to food. She understood that she made mistakes by focusing on making her own life easier instead of focusing on Colton's needs.

In her testimony about discipline techniques, mother denied that the children were required to finish their leftover oatmeal for lunch. She also denied that she ever punched, pinched, or pushed Colton. Mother also claimed that she never made fun of Colton's acne. She testified that she did take away Colton's acne medication after it stained one of her towels, but she insisted that there was another acne wash available to him. Timeouts were described as lasting only minutes instead of hours, and she stated the children did not have to stand for the whole timeout period.

On the date of the altercation between Tyler and Colton, mother testified that she was sleeping when Tyler ran into her room. Tyler claimed that Colton attacked him. Mother testified that she could hear Colton screaming, " 'I'm going to kill you, [f]'n Tyler. You're weak, I'm going to strangle you, [f]'n Tyler.' " She explained that everything became quiet after she told Colton to go to bed. Mother indicated Colton made the decision to sleep on the floor in Jessica's room. Mother testified that Colton provided her and Tyler with letters on the day following the altercation, and she denied directing Colton to write either letter.

Colton ran away from the home while mother and Jessica were working in the yard. Mother felt that Colton wanted her to point out each weed, and Jessica also wanted her attention. Mother became irritated that Colton would not allow her to spend time gardening with Jessica. Mother told him, " 'I do not want to argue with you, leave me

17.

alone,' " and she walked away from him. She thought Colton went to the bathroom, and she did not know he had run away until law enforcement arrived. Mother denied that she refused to provide Colton with his clothing, and she brought three bags of clothing to her visitation with Jessica.

Argument and Ruling

After hearing testimony from each of the witnesses over the course of several days, the juvenile court allowed each party to present argument on the afternoon of October 16, 2024. The agency's counsel argued the restrictions and punishments in the home were "harsh, domineering, and oppressive." While some of the restrictions could be viewed as appropriate on their own, the agency asserted the totality of the restrictions went far beyond appropriate to create an environment of cruelty. The children's counsel indicated the evidence supported the allegations in the petition, and she agreed with the agency's recommendation for family reunification between Jessica and mother.

Mother's counsel argued Colton's statements had changed significantly over time, and she characterized the case as being about "formative trauma." Her counsel characterized Colton's allegations as a response to the "intolerable circumstance" that mother might be dying. Mother's counsel requested that the juvenile court refuse to find any basis for jurisdiction and return the children to mother's care.

After hearing argument from the parties, the juvenile court reasoned as follows:

> "This case comes down to an issue of credibility. I don't think it's simply a question of formative trauma. I don't think that that concept is one that is hard to understand. Certainly, any child, whether they've been in foster care or not, that's been traumatized, can have a lot of problems as they grow up and become teenagers and adults..… [¶] So I'm not discounting the trauma theory, but I'm not accepting the trauma theory of formative trauma as the reason that I should disbelieve what Colton is saying or that he's exaggerating to such an extent with these stories about locked refrigerators, which we know is undisputed, or about restricting him, or about the showers, which is disputed, or about the bathing or the bathroom or the food or the oatmeal. All those things I have to decide the credibility.

18.

"Do we have this draconian home that Colton describes, or do we have this loving, bonding home that [mother] describes?

"What really troubled me in trying to make that decision about credibility, and writing Colton off as just being—exaggerating or lying because he has a past history of not being truthful, is when confronted on examination—even on direct examination by counsel, [mother] has a very difficult time in not trying to control the situation. Even in a situation where she is making the case for herself, that she loves her children, she's bonded with them, she wants them back, she recognizes she's made a few mistakes, she'll correct them, she was controlling as much as she could in that conversation with counsel. And on cross-examination she was evasive. She redirected. She was not as straightforward as I would expect a mother to be in this situation.

"I give her the consideration of what she's been through, and I believe that her emotions on the stand were very true, that her crying, that her [in]ability sometimes to articulate because she was emotionally upset was true and credible; however, I'm not certain why that is. I'm not certain.

"Is it because of the separation and the fear that the family is being damaged or irreparably harmed, or is it because she's concerned about being accused of doing a lot of bad things that most people would say, including myself, 'How can you put a lock on a refrigerator? How did you do these things to a child to the point where they can't be in that household anymore?'

"And so when I'm weighing the credibility, I listened to Colton. Colton was credible to me…. Shaw was credible to me. [Martha] was credible to me.

"I found much of the testimony of [mother] to be deflecting, to blaming others.

"And what really troubled me, and I guess troubled … Shaw, was that when she came into this household and met them for the first time, she was overwhelmed by the fact that, as she said from the get-go, everybody— everybody, [Susan], [mother], Jessica, Tyler, they were against Colton, had nothing good to say about him.

"So that tells me a lot. That tells me that there is a deep problem, that there has been a lot of emotional harm and trauma done to this child. Perhaps done with some intention of trying to correct his negative

19.

behaviors or disruptive behaviors, or—or, more likely, that the tolerance of [mother] during a very difficult time in her life was very limited in what tolerance she could accept and that this was way over her ability to handle."

The allegations pursuant to section 300, subdivisions (b)(1), (c), and (i) were found true except for the allegation that mother directed Tyler to attack Colton. As to disposition, the juvenile court ordered family reunification services for mother. Mother filed a timely notice of appeal on October 23, 2024.

## DISCUSSION

Mother contends the facts described by Colton did not "constitute cruelty or facts that substantiate a finding under section 300, subdivision (i)."

### A. Legal Principles

Section 300, subdivision (i) provides that a child comes within the jurisdiction of the juvenile court if he or she " 'has been subjected to an act or acts of cruelty by the parent or guardian or a member of his or her household.' [Citations.] The Legislature did not define 'acts of cruelty' [citation] due to the myriad forms such conduct may take." (*In re N.R.* (2023) 15 Cal.5th 520, 548.) The court must make its factual determination " 'based upon the common meaning of the phrase and the totality of the child's circumstances.' " (*In re D.C.* (2011) 195 Cal.App.4th 1010, 1017.) An act of cruelty does not require proof that the parent intended to harm the child. (*Id*. at pp. 1015–1016.) Such acts "might be described ... as acts that produce a shock of conscience." (*Id*. at p. 1017.)

### B. Standard of Review

A juvenile court's jurisdictional findings are reviewed using the substantial evidence standard of review, where we determine whether evidence of reasonable, credible, and solid value supports the court's findings. We do not reweigh the evidence, nor do we consider matters of credibility. (*In re Sheila B.* (1993) 19 Cal.App.4th 187, 199–200.) " '[W]e must uphold the court's [jurisdictional] findings unless, after reviewing the entire record and resolving all conflicts in favor of the respondent and

20.

drawing all reasonable inferences in support of the judgment, we determine there is no substantial evidence to support the findings.' " (*In re J.N.* (2010) 181 Cal.App.4th 1010, 1022.)

### C. Analysis

In order to assist us further in understanding what constitutes "cruelty" under section 300, subdivision (i), we turn to established definitions of the term. Black's Law Dictionary defines "cruelty" as the "intentional and malicious infliction of mental or physical suffering on a living creature, esp[ecially] a human; abusive treatment; outrage." (Black's Law Dict. (12th ed. 2024) p. 476 .) Webster's Dictionary has defined "cruelty" as "1. The quality or condition of being cruel; inhumanity; hardheartedness. 2. … a cruel action, remark, etc. 3. … willful mistreatment seriously harmful to life or to physical or mental health[.]" (Webster's New World Dict. (2d ed. 1982) p. 341.) "Cruel," in turn, is defined as "1. deliberately seeking to inflict pain and suffering; enjoying others' suffering; without mercy or pity. 2. causing, or of a kind to cause, pain, distress, etc." (*Id*. at pp. 340–341.) Thus, the term "cruelty" has different meanings in different contexts.

Mother references cases where appellate courts determined that there was substantial evidence to support findings pursuant to section 300, subdivision (i). In *In re D.C.*, *supra*, 195 Cal.App.4th 1010, a mother threw her seven-year-old daughter, who was terrified of the water and screaming in fear, into a park fountain and held the child under for long enough that onlookers thought she was trying to drown her. (*Id*. at pp. 1013–1014.)

In *In re Benjamin D.* (1991) 227 Cal.App.3d 1464, the court found the following acts by the father sufficient to establish that the child was subject to an act or acts of cruelty: 1) the father repeatedly pinched the two-year-old child on the stomach and arms, severely enough to leave visible impressions for days; 2) within days of the child's birth, the father took the family to the park, but would not allow the mother to cover the child,

although the weather was cold and windy; 3) the father poured a packet of hot sauce into the newborn's mouth at a local fast food restaurant; 4) during the first nine months of the baby's life, he slept on the floor because the father did not want to buy him a crib; 5) the father would frequently throw the baby into the air, usually hurting him in the process; and 6) the father also held the baby under a cold shower to stop his crying or when he soiled his diaper. (*Id*. at pp. 1466–1468.)

Mother also cites to *Deborah S. v. Superior Court* (1996) 43 Cal.App.4th 741, where the appellate court sustained allegations of cruelty that included: 1) the mother confined the child to his room for prolonged periods of time; 2) the mother allowed the child to sit in his own waste for extended periods of time; 3) the mother tied the child's ankles and wrists together to restrain him and put a sock in his mouth to prevent him from screaming; 4) the mother confined the child to a darkened closet for extended periods of time; and 5) the mother confined the child to his crib by placing a board across the top and then jabbing him with a screwdriver through the crib's slats. (*Id*. at p. 746.) However, jurisdiction was not at issue on appeal. (*Id*. at p. 744.)

In comparison to those cases, mother emphasizes the fact that Colton was an able-bodied teenager "who had been free to run away from home by walking to a neighbor's home more than once." She highlights the fact that Colton did not appear dirty or malnourished on the date of his removal. Thus, mother argues the facts described by Colton regarding the restrictions and punishments in the home were not sufficient to support a finding of cruelty. However, the fact that in those cases, the children suffered cruel acts that were more severe than those inflicted on Colton does not mean there was insufficient evidence to support assuming jurisdiction over Colton under section 300, subdivision (i).

In the present case, the juvenile court specifically found the testimony of Shaw, Martha E., and Colton to be credible, and mother was not found to be credible throughout her testimony. We acknowledge that there were a variety of conflicting accounts

22.

regarding the events that occurred in mother's home. Mother and her adult children all testified that mother provided proper discipline in the home, and Colton was characterized as a child with behavioral issues by each of them. In Colton's testimony, he reiterated his prior reports of improper restrictions and punishments, which included: 1) withholding food as punishment, 2) locking the refrigerators and pantry at night, 3) forcing the children to stand in a bedroom for hours, 4) utilizing cameras to observe the children in their bedrooms during punishments, and 5) requiring Colton to rewrite apology letters for the physical altercation with Tyler before he could use the restroom or eat food.

The juvenile court was well aware of the dynamics of the home given the extent of the testimony provided by several family members. It considered them carefully and made determinations on the record about the credibility of witnesses and the weight of testimony. In the end, taking account of all the evidence, it found that Colton's version of events was credible. The fact that Colton also made contradictory statements does not necessarily mean his reports of abuse should not be believed. Children frequently recant their accounts of abuse. (*In re S.A.* (2010) 182 Cal.App.4th 1128, 1148.)

To reverse in this case, we would have to discard the juvenile court's findings on the credibility and weight of the evidence. We cannot do this, for there is nothing inherently incredible or impossible about the events the court found true. It is not enough that the facts the court found might have been highly unusual or that there were substantial conflicts in the evidence. The weight of all those matters was for the court to determine, within the bounds of reason.

" 'To warrant the rejection by a reviewing court of statements given by a witness who has been believed by the trial court or the jury, there must exist either a physical impossibility that they are true, or it must be such as to shock the moral sense of the court; it must be inherently improbable and such inherent improbability must plainly appear.' [Citations.] It also is true that uncertainties or discrepancies in witnesses'

23.

testimony raise only evidentiary issues" to be resolved by the finder of fact. (*People v. Watts* (1999) 76 Cal.App.4th 1250, 1259.) Under the circumstances of this case, basic appellate principles bar us from discarding the juvenile court's findings of credibility.

In sum, we agree with the statements the juvenile court made when it sustained the cruelty allegations: "there has been a lot of emotional harm and trauma done to this child. Perhaps done with some intention of trying to correct his negative behaviors or disruptive behaviors, or—or, more likely, that the tolerance of [mother] during a very difficult time in her life was very limited in what tolerance she could accept and that this was way over her ability to handle."

Mother's conduct went far beyond what an ordinary parent would do to punish a child, especially one who had already been exposed to significant trauma as a young child in foster care. In our view, mother's severe and unnecessary restrictions on food, hygiene, and freedom of movement constituted a malicious infliction of physical and mental suffering on Colton. Drawing all reasonable inferences from the record, we conclude substantial evidence supports the juvenile court's finding that Colton was subjected to acts of cruelty by mother.

**DISPOSITION**

The juvenile court's orders are affirmed.

GUERRA, J.[*]

WE CONCUR:


HILL, P. J.


SNAUFFER, J.

---

[*]    Judge of the Fresno Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.